Good morning. The first case for that matter, the only matter for argument, versus Consolidated Matters this morning, in what we will call the Vento Matters. I believe Mr. Scherr. Yes, sir. Go forward, please. Good morning, Your Honors. I'm Gene Scherr, representing the Government of the Virgin Islands. I'd like to reserve five minutes for rebuttal, if that's all right. And before I begin with the Court's indulgence, let me introduce some other members of our team. With me at council table is Assistant Attorney General Tamika Archer, whom you met yesterday. And behind me is Governor John DeJong, who unfortunately has to leave before the argument is over today. This case is important to the Virgin Islands Government, not only because of the revenues at stake from the taxpayers here, but also because of broader financial and institutional concerns that I'd like to address briefly before discussing what we view as the four legal errors that are of greatest concern for the government. Financially, this case is of substantial short-term importance because it's the first case to address in a civil tax proceeding the application of the pre-2004 statutory test for VI residency. So the Court's analysis in this case will likely affect scores of other pre-2004 cases that are currently pending either before the IRS, the tax court, or the district court for the Virgin Islands, and in which the IRS has challenged taxpayers' claims to be bona fide VI residents, and in which potentially hundreds of millions of dollars in tax revenues are at stake. So this is related to the cases we heard yesterday, the Cooper and et cetera, et cetera. Yes, it is. It doesn't involve exactly the same issues, but it involves the same tax system. And institutionally, this case is even more important in the long term because it gives this court an opportunity to address the second of two daggers, if you will, that the IRS has aimed at the government's economic development program, a program that depends on the Virgin Islands government's ability, pursuant to sections 932 and 934 of the Internal Revenue Code, the federal code, to offer tax reductions to U.S. citizens who invest in and take up residency in the Virgin Islands. Now, in Appleton, this court addressed the first of those two efforts by the IRS, which was an attempt, in this court's words, to do away with the usual three-year statute of limitations for taxpayers who participate in the government's economic development program. And, Judge Ross, that problem is at the heart of the double taxation problem that you were hearing about yesterday in the McGrogan cases. If, in those cases, the IRS had simply issued its notices of deficiency within the normal three-year statutory window, there would be no risk of double taxation. But this case involves the IRS's second dagger, which is an ongoing attempt in a variety of ways to impose standards for VI residency that are, in fact, stricter than those that Congress itself has imposed, and in so doing, to deny residency to people like the Ventos, who are the very kinds of entrepreneurs that Congress sought to draw to the Virgin Islands when it authorized the economic development program in Section 934 of the Code. And that affects people who, by the way, like the Ventos, continue to make the Virgin Islands their principal home to this day. So with that introduction, let me briefly address four specific components of the IRS's attack on residency, which, when adopted by the district court, gave rise to distinct legal errors that we think require reversal. Now, one important component of the IRS's strategy with respect to residency is its effort to abolish, at least as to that question, the presumption of correctness and the resulting burden of proof that ordinarily favor deficiency notices issued by the agency charged with collecting the tax. And as a general matter, that presumption of correctness has been well established since at least 1933 in the Supreme Court's decision in Welch v. Halvering. But what the IRS keeps trying to ignore, and this is relevant to the discussion you had yesterday, what the IRS keeps trying to ignore and what seems to stick in its craw is that in Section 932C2 of the Internal Revenue Code, Congress entrusted the Virgin Islands government, not the IRS, with responsibility for collecting federal taxes from Virgin Islands residents and reviewing their returns in the first instance. And, yes, the IRS retains the right to disagree with the BIR's judgment, but it has to do that within the three-year statutory window. And one consequence of Congress's decision to make the Virgin Islands government the collector of federal taxes for VI residents is that the determinations the VI government makes are entitled to a presumption of correctness. And that presumption was with... Determinations as to what? Does determinations suggest merely calculations and tax computation matters? No. Does it extend... Where in the statute can we find a suggestion that the Bureau's determination with respect to a legal question like residency is something to which we should defer? Two places, Your Honor. First of all, Congress made the decision to confer that authority on the Virgin Islands government in 1986. And in 1986, the general principle that an agency charged with collecting taxes is entitled to a presumption of correctness, that principle was already well established in the law. A presumption of correctness as to what? Can you show me either statutory language or any cases that suggest that there is a presumption of correctness that attaches to a determination of residency? I don't think the issue has ever been addressed specifically in the residency context, but I think it follows from first principles that any determination... are matters within the realm of agency experience and expertise. That's right. I'm not sure that a determination relative to residency has the same substance to it or is in any way the same subject matter. Well, the presumption of correctness, as it's been articulated in the case law, is that the tax that the collecting authority imposes or says is due is entitled to a presumption of correctness. That is, the tax that the agency says is due is, in fact, due. Well, if in a case like this, the residency determination underlying that assessment was wrong, then the tax that the agency says is due isn't, in fact, due. And so I think this is a matter of logic and first principles. The presumption necessarily includes the underlying determinations as do things like residency. So you would extend the presumption of correctness to every determination that is made incident to or necessary for the ultimate tax computation, is that correct? That's correct. But, again, it's a presumption. It can be rebutted. Would there then have to be an agreement between the BIR and the IRS as to what the definition of residency is? I don't think so. Is there? I mean, I think there would have to be, wouldn't there? Well, I think if the BIR is entitled to a presumption of correctness in its determinations of residency, then the IRS would face that presumption if it wants to challenge it. You could say there was a legal determination as to what is the definition of residency and there is a factual determination of whether the taxpayer meets that definition. And have we an agreement as to the legal definition of residency between the BIR and the IRS? We have. Today we have the outlines of an agreement by virtue of the 2004 Act, which tightened and modified the requirements for residency. I don't know that we have an agreement as to how the new statute applies in all circumstances. I mean, isn't that really the problem we have here today as to what really is the definition of residency? That is, in large part, the problem. If the parties agreed, the sure test applied. Yes. That's our framework, at least. If we can agree on anything, we don't have to follow it, obviously. Right. Well, and that was the basis on which the BIR made its determination that the Ventos were, in fact, residents. Is there any reason why we shouldn't adhere to that Seventh Circuit test? This court, as far as I know, and I asked the law clerk to check it yesterday, has never adopted it. Maybe he hasn't even cited it. So this may be an excellent opportunity for us to come to grips with that multi-factor test. Is there any reason why we shouldn't adopt it? No, Your Honor. We think that test is perfectly appropriate. Right. And both sides, as Judge Hardiman suggested, agree with that. I'm interested in a follow-up to your argument on the presumption of correctness, because it also involves procedurally and evidentially, in this case, is Section 7491A1, right? Right. The Taxpayer Bill of Rights. And, well, specifically with respect to the burden and how evidence, credible evidence, according to the language of the statute, is presented and considered. Right. You see where I'm going with this? Because for the life of me, I haven't been able to figure out how that works, just how a court or trial court is supposed to apply that regime. What's the taxpayer's position on that? And did the district court here err in not properly applying 7491? We think it did. We think 7491 does apply as a matter of law. I don't know that the parties specifically pressed 7491 before the judge, but it does apply as a matter of law. But the BIR did argue that the IRS had the burden of showing non-residency, and the presumption of correctness is consistent with that. Now, another component of the IRS's attack on residency here and in other cases is the idea that a desire to limit federal income taxes somehow undermines bona fide residency. And, in fact, the whole point of Section 934B, which I mentioned earlier, and the economic development program that was established and authorized under it, is to encourage entrepreneurial U.S. citizens to relocate to the VI so that they can reduce their federal taxes. It wasn't the tact that the district court took. Not that there is anything wrong with pursuing a strategy of tax avoidance, but rather that it was simply about the timing that was incident to the efforts of the Ventos here. Specifically, that December 31, 2001 date. The rushed efforts, which as far as I can tell from the district court's determinations, simply had not been sufficiently completed to warrant a determination of residency. Our problem with that analysis is that the district court used a motive to reduce taxes as a reason to find the taxpayers' explanation for their activities at the end of the year not credible. Why can't that be put into the mix? I mean, if there had been a motive to reduce taxes, then the Christmas party looked different than it may have looked if there was no motive to reduce taxes. I mean, I don't understand why that can't be part of the mix. It certainly can't be determinative in any way. But you're saying the judge can't even consider that? Well, we think to the extent that the judge considers those kinds of motives, it's undermining Congress's intent in setting up a system that allows taxpayers to get tax benefits for moving to the Virgin Islands and setting up businesses here. So at a minimum, it's an area where courts need to tread very carefully and avoid doing the analysis in a way that we think the district court did, that sends a message to other taxpayers, other potential participants in the economic development program, that if you come here and try to take advantage of this tax program, the IRS and perhaps the local courts are going to fight you tooth and nail. Why isn't the message just that if you want to take advantage of this, then you need to make sure you're a resident as of December 31, 2001, and you need to accomplish the goal. You can't sort of accomplish the goal or take steps toward accomplishing the goal. The problem we have with the district court's analysis is that it went further than that. In fact, the district court's initial opinion relied almost entirely on the desire to reduce taxes, and it was only in a subsequent amendment that it added this new language focusing on the timing. Well, what change took place in the amendment that you think is so material? It looked like, aside from the fact that there was a lengthy footnote, it looked to me like the corrections were pretty insubstantial factual corrections. Well, the footnote changed the district court's whole theory of how tax motivations mattered. His initial theory was that in 2001, Mr. and Mrs. Vento knew that if they could establish residency in the VI, they would save $9 million in taxes. He was specific in the amount of money he suggested they knew about. He also indicated in that footnote that by the time of trial, they did know. And trial is when they testified, and trial is when the credibility determination is made, right? But the problem was the legal question was. Am I correct in my recitation? I think that is a fair description of what he did. The problem with that, if I could quickly answer before I. Put five more minutes on the clock, please, Trish. Thank you. The problem with the court's analysis there was that it went beyond simply saying, I'm going to take this into account. It was crafted in such a way that it sent a message, we think, to potential participants in the economic development program that it's going to be very hard to establish residency and that we're going to look closely at your tax motives for doing that. But let me. You think the implications are that it's going to be hard to establish residency? We think the way the district court's opinion is written is there's a real hostility to any attempt to take advantage of legitimate. You know, if the Ventos had sold the property in Nevada and moved here and spent the entire summer and fall and winter, you're suggesting the district judge would have found against them that they weren't residents? As of December 31st? Yeah, the key legal question, of course, was what their intention was as of December 31st of 2001. Sure, but there's a substantial record here. This morning and yesterday I was taking a look at some portions of the record, and it sounds corny, but at one point I remembered an old turn-of-the-century poem by Edgar Guest. It takes a heap of living and a house to make it home. Now, I realize we're not talking about a home. We're talking about a residence. But one of the problems here, I think, as far as the district judge was concerned, is there hadn't been a heap of living going on in that home. There was a substantial record of incompleteness relative to preparations and residency in that very property. It wasn't there. Well, the question is did they intend to be residents of the Virgin Islands as of December 31st? And so really the best evidence of what their intentions were as of that date was what happened the next year. I know Mr. Dershowitz is planning to go into the record on exactly where they were in more detail. Incompleteness, however, evidence appropriately considered by the district court, fully recognizing the import of intent in this equation. If by incompleteness you mean the incompleteness of the repairs to the house. To the extent that much of the property was not even considered particularly habitable. Well, to the extent the district court found that the property was not habitable, we think that's a flat-out clear error based on the evidence in the record. And I know Mr. Dershowitz is going to talk about that some more. But there is no factual support for that. And when you look at the evidence the district court cited in support of its finding that the house was not habitable, it simply doesn't support the conclusion. The home inspector's report, neither the home inspector's report nor Mr. Thomas' testimony, Mr. Thomas' testimony was that the house was 50% livable, which means it's livable. It's a large house, and if 50% of it is livable, a lot of people can live there. I want to briefly touch on the two additional legal errors that we wanted to present, one of which is effectively requiring taxpayers to give up a second residence in order to claim residency in the Virgin Islands. And as the district court ultimately recognized, rejecting the IRS's argument on this point, taxpayers have the right to have multiple residences. But the mistake the district court made was in saying that maintaining another residence, in this case a residence in Nevada, is highly probative of the taxpayer's intention to have a residence in the Virgin Islands. And the reason that's problematic is that if maintaining another residence is highly probative of whether you have adopted a residence in the Virgin Islands, that effectively destroys the legal right to have two residences because it says to taxpayers who are contemplating a move, you know, if you maintain any significant ties to a prior residence, that's going to be disqualifying. And we think that was a legal error that the district court made. The final one that I wanted to mention that poses an institutional threat to the economic development program is the district court's treatment of residency evidence from years subsequent to the tax year in question It is undisputed that Mr. and Mrs. Vento continued to make the Virgin Islands their home as of the time of trial. And indeed early in the trial, the IRS's own counsel admitted that Mr. and Mrs. Vento had crossed the line of moving from Nevada to the Virgin Islands sometime in 2002, and that's at page 577 of the joint appendix. And yet the district court never considered that evidence, or the fact that the Ventos were still residing in the Virgin Islands virtually full time as far as I can tell, as part of his analysis as to what their intent was at the end of 2001. And so for each of those reasons, we ask the court to reverse. All right, thank you. We'll have you back on rebuttal, Mr. Shearer. Mr. Dershowitz. Thank you, Your Honors. Nathan Dershowitz on behalf of the taxpayers. I'd like to reserve four minutes, if I may. I'd also like to incorporate and adopt all of the arguments that have previously been made with a couple of minor exceptions. The first one is in answer to Judge Hardiman's question, I think the real criteria, and that's on the question with respect to Sertoric, I think first, the actual guidelines are within the regulations, and the regulations provide that so long as it's more than transients or sojourners. Now, how you interpret that has never been decided by this court. Let's go beyond that, and that is Sertoric. If you look at Sertoric conceptually, not factually, we agree with Sertoric. But there's a significant difference between Sertoric and this case, and that is you're dealing with, one, a different statute, and two, you're dealing with a different concept and a different objective. And if you look at the unique attendant circumstances, which Sertoric talks about, the principal ones you have to look at are the language of the statute and the intent of Congress. Those are the critical criteria. And if you take a look at Sertoric, what happened there was you had a requirement of uninterrupted, uninterrupted as part of the statute, residency within an area. And what you had factually there is that the time life employee spent only 25 days, 25 days in the city that was ultimately determined to be his residence. But he used that place to travel all around the whole area and did his job in a number of different places. There's some factual distinctions. Isn't this, assuming we apply the Sertoric case, an exquisitely factually based determination to be made ultimately? No, for two reasons. First, let me not address that. It does suggest that it has to be exquisitely factual. Yes and no. It depends upon the circumstances. I've reviewed 149 factual findings made by the court, and I don't think we disagree with most overwhelming number, maybe four or five altogether. There are two essential findings the court made which were critical. One is in footnote seven. The court indicated that to the extent that someone, the claim is that someone must be a resident in order to take advantage of the economic development program. He said that was incorrect. Well, the court was wrong on that. So what he did was he questioned the whole motive that the witnesses testified to, which was their motive for coming to take advantage of the economic development program. So that is a critical error of law that pervaded the decision. It's the inferences from the facts. The inferences from the facts, Your Honor, is a mixed question of fact and law. Second, and I'd like to go back to your premise, and remember the Sertoric is a situation where Americans who go abroad have a tax exemption in filing those taxes in the United States. So that there is a loss of income to the United States granted by Congress. Here the motive or the circumstance is exactly the opposite. Here Congress is encouraging people to go and live in the Virgin Islands to advance the objectives, as this court said in Appleton, of the Virgin Islands, and it has created a system which has a less onerous responsibility there. It is a question of year end as to whether the... Going back to Sertoric, basically you're saying he was in, what, Singapore 25 days? Correct. But wasn't he out of the United States for most of the period? So wasn't the issue more of where he was, was his residence rather than that he was staying in the United States? Your Honor, what the decision here did, which was interesting, is the court, in a footnote, went through the American Express bills and listed the times when the Ventos were not in the Virgin Islands. But if you go through those same listings and you do a Sertoric type of analysis, you see they spent more time, more time in the Virgin Islands than anywhere else. They vacationed during that part of that period of time. They were out on business trips part of that time, which is in fact what happened with Sertoric. So taking a Sertoric approach to the facts and looking at it from the point of what was their major place where they were spending more of their time than anywhere else from August 2nd to the year end, at least as to Richard and Lana, they clearly spent more time, more time in the Virgin Islands than certainly in Nevada, than certainly in Hawaii, than certainly anywhere else. The net effect of the court's type of determination is they're not residents of any place. And remember, the standard is a very, very low standard for us under the regulations, but more than that, it's a congressional objective to try to transfer funds from the Treasury, a method of transferring funds from the Treasury to the Virgin Islands and encouraging the economic development of the Virgin Islands. So if you look at Sertoric, you must take those factors into consideration. I'd like to just mention... Before you move on, Mr. Schwartz, I have a very practical question. You know the details of the finances certainly better than I do. Let's assume for a minute that Mr. and Mrs. Vento satisfied the requirements, but the daughters did not. Can you tell us what the dollars at stake are? The details here are, quite frankly, are somewhat escaping me. My sense is that there's tremendously more at stake through the LLCs created relative to the daughters than there are Mr. and Mrs., but I'd appreciate clarification on that. Your Honor, I have spent days trying to answer that question, and I have to tell you that I have trouble answering it because it premised on the $9 million figure that was thrown out by the IRS during the discussions, which I don't see the basis. I cannot get a handle on how that figure came up because there's an agreement on some of the items. There's an agreement on others. I think the practical effect may be relatively limited, and therefore if you make a separate determination as to Richard and Dick, I think the primary savings will occur, and if you separate out the daughters, it won't be that economically significant. But I think you also have to make a clear distinction between the two. If that's the case, why would you even try to fight the fight for the daughters? I mean, their cases are markedly weaker than Mr. and Mrs. I agree, except that I think the decision has to be made as to how you treat students under the circumstances. To the extent that the court looked at Denver, looked at Boulder, Colorado. She owned a home there with her boyfriend. But she paid out-of-state taxes. I don't know about your honor, but I know a lot of students who live in other places, but that's not their residence. So nobody would This is Gail, I guess we're talking about. She was derivatively a Nevada resident while she was a student in Colorado. I don't know how that transports her into being a VI resident. The question is whether, you know For purposes of the dollars at stake, separating out the daughters from the parents is immaterial in your view? Not immaterial. It's significant, but not as significant as would be suggested by the way the decision was written. And I would like to also separate for a moment the remedy. If you take a look at what the actual facts as found by the trial court, I think there's clearly enough evidence as to Richard and Lana's intent. And this court can reverse on the basis of the findings that were made. When you have someone who registers to vote, and you have someone who files taxes in the Virgin Islands, buys a house, at which point when they bought the house, they were told it was clearly habitable when they bought it. They make changes in there at that time. Richard, remember, set up three corporations. And in 2001, the Virgin Islands changed some of the economic development programs, seeking to have technology companies come to the Virgin Islands. So Richard is the perfect person. He set it up. He then looked for office space. He was hiring people. And he was starting the process for purposes of the economic development program, which would be down the road, years down the road. So he satisfied what I consider under these circumstances a much more minimal requirement than you have, for example, in Serturic. And so clearly as to them, as to the daughters, what I would suggest is this court come up with guidance, make a determination as to what transient and sojourner means, come up with criteria that apply to the Virgin Islands. Remember, I was emphasizing all of the other cases. All of the other cases deal with different objectives of Congress or different statutory language. This is the only case that deals with a statutory provision which says by year's end. And there's a reason why Congress chose that language aside from, for example, the Puerto Rico case, where it says for the full year or Serturic and its progeny, which all deal with the question of an overseas, an American who goes overseas and doesn't pay American taxes. So if you take all of that into consideration, the record here, once they give up American voting rights, they file the taxes here, they have a presence here, and they undertake business opportunities here, I can conceive of no reason under the statutory, under the regulations, why this court shouldn't say for purposes of the Virgin Islands, this carries out the objective. That's sufficient under the circumstances. The argument is it's the intent. It's not the actual. No, it's the language of the statute. The language of the statute and why Congress chose that language. It requires intent only. I mean, when you say intent, for example, let's say, let's change the facts a little bit. Let's say that Mr. and Mrs. Vento purchased Estate Friedendahl and looked at it and said, wow, this place needs a lot of work. And they hired a team of contractors to come immediately after securing the land. And then they pursued an 18-month course of rehab with the intent of moving into the property as soon as it met their specifications. Is that enough? Even though they weren't able to physically move into the property until the end of 02, is that enough for them to prevail as of December 31, 01? There are two factors. One is I think you need a presence. So the way you're phrasing it, I don't know where they stayed the rest of the time. So they didn't come because they intended to. Let's say the intended, the facts were clear. They were going to move here. They were going to sell Nevada, sell Hawaii. They were going to spend the rest of their life here. But they couldn't accomplish it until the end of 02 because of all the work that needed to be done. Do they win under that scenario? And my answer is a bit of a hedge purposely. And the reason I'm hedging is because, one, you have to define transient and sojourner under that fact situation. Second is I believe the answer is you need a presence. They had a presence. That doesn't work. Then they don't have a presence. But it really does come down to the habitability, the relative habitability of the state freedom doll. Unless they came and stayed in a hotel or a condo on an island, they need to take some overt steps to establish a presence. Let me take one step back, John. And I think the answer to your question is I think it really is a question of intent. But how does a court make a determination of intent? You have to look at objective facts. So I think the answer really is it's a question of their intent. And that's why looking at three years later where they effectuated their intent. Objective facts are what is derived from circumstantial evidence. Intent is almost always proven by circumstantial evidence, which takes me back to what I had asked earlier, that this seems to be just extraordinarily fact-based and call upon the finder of fact to sift through all of that circumstantial evidence and try to make something of it, particularly with respect to intent. Your Honor, if you go through, and I've done this carefully. I did it as if one would do it on a pleadings. And that is I went through every one of the factual findings that the trial court made, going line by line by line. Virtually every factual finding with the exception of habitability and maybe one or two others are not in dispute. If the inference is drawn from the fact... If you were pointing to fact after fact after fact that was not supported by the record and we were dealing with arguments of clear error, it would make things a lot easier. But since you're not, you seem to be suggesting that you differ with the district court in the way he weighed certain of those facts. Which creates a big question of... Or in his having simply not articulated in his written opinion some facts that you wish to derive from the record and which were otherwise uncontested. Two points to that. One is I'm talking about inferences that are drawn from the facts, which is a mixed question of law and fact. But second, there are at least four major errors. And I wish I had answered Your Honor's questions from the prior counsel. I didn't get to the areas I wanted to go through. But there are at least four major, major legal errors. The first is how you look at the facts where he had tax avoidance as a problem and then made his determination, then retroactively came up with post hoc rationales without modifying or evaluating his facts. Taking the motive, the clear motive, statutory motive, congressional intended motive of setting up these companies and wanting to do so in 2001 and throwing that out. Failing to recognize residency can be... Failing to recognize that multiple residency is accepted. He says at one point, I'm not looking at abandonment. But if you read the decision, that was an afterthought that was put in because he was looking at abandonment. And then one more point. All right. Very quickly, one more point. On the presumption, the court relied upon the Lansman decision, which was not for publication, a decision on a pro se applicant that was four years prior to or three years prior to the adoption of the Bill of Rights. Can I comment? One more point in answer to Judge Roth's question earlier. It will take against your rebuttal time if you'd like. It will take it against the rebuttal time. It's an effect rebuttal anyway. And that is on the question on the presumption. This case has one unique factor to it, and that is the action was instituted in the Virgin Islands. So the district court had jurisdiction. The jurisdictional predicate was the action being brought against the... by the taxpayers against the Virgin Islands and an intervention by the IRS. So in that context, the presumption, which normally applies to the institution, in this case the BIR, is the institution against whom the litigation was present. And they then, since they joined it, the two parties in that action agreed. And if this wasn't there, it should have been brought in the tax court. But what I'm saying is they intervened in a proceeding where the presumption applied, and they have no right to then change the presumption by intervening that way. So it's a slightly different situation than the normal situation. All right. We'll have you back in rebuttal. Thank you. Ms. Rubin? Good morning, Your Honor. May it please the Court, my name is Jennifer Rubin, and I represent the United States in this case. As the Adams and Bergersen cases make clear, it, in fact, does take a heap of living to make a house a home. Adams is very clear about that and actually uses those terms and talks about how having a house, having some stuff in it, maybe even occasionally sleeping or eating there, it doesn't turn into a home. Whereas Bergersen says it doesn't turn into a residential base. Here what we have is a court that made many factual findings for not being challenged by anyone in this case, and he determined on that that really none of the Ventos had made the Virgin Islands a residential base. Well, they have now. That's clear, right? And counsel's citation of 577 I just checked. In fact, in the record, counsel did concede that sometime in 2002 the parents crossed the Rubicon, right? Well, if you actually look at JA 1286, the counsel actually clarified this. Now, this was, and the clarification is we do not concede 2002. We do not concede it. Now, what this tells you is, number one, there was no unequivocal confession, and that's required for judicial admission under Glick, and under Perroto and Glick, a statement of a legal theory of the case is also not considered to be a judicial admission. Now, in their briefs, both parties, both counsels cite the alleged confession, but do not acknowledge the clarification to this point. What exactly does the clarification say? I mean, this is pretty clear language at 577. It says, in our view, Your Honor, what we will prove is that the line of moving from Nevada or the United States to the Virgin Islands, that's a line that was crossed sometime in 2002 for Mr. and Mrs. Vento. That's pretty clear. The quote said, quote, we didn't concede and we don't concede that Mr. and Mrs. Vento were residents at the end of 2002. In fact, there are task court cases pending regarding 2002, which the United States has specifically alleged that neither Richard nor Lana were residents in 2002. Are they residents now? I don't believe there's any tax case of challenging them for now for any tax year right around now. Is that a yes? I'm not quite sure what to say. Did they invest $20 million in the state, Fredendal? I don't know that I have authority to concede this year. Well, you're here to argue the case. I am here to argue the case. You have authority to say what's needed. I think you have authority to answer my questions respectfully. I read something in the record that this family invested $20 million in the state, Fredendal. Is that accurate or not? That is accurate. And is that not enough to make something a residence, or do you need to invest more than $20 million? I think you have to, as counsel has agreed, you have to have both subjective intent and physical presence. Presuming that they have the physical presence necessary and that they intend to have this be a residence, then yes, it would be a residence now. To me, I'm a little at a loss with some of the arguments of the government because the government seems to be trying to penalize people for following the law that would be tax advantageous to them. I mean, what's wrong with that? Are we really talking about here not some sort of moral failing but just a matter of technical timing here? Isn't really the nub of this case whether or not as of December 31, 2001, the parents and the children satisfied the Shorrock test? Isn't that what this case all comes down to? I certainly don't think you need to find that they were morally bad in order to find that they were not residents. What the district court here found was that the Ventos could have taken some of the money. That's not answering Judge Hardeman's question, and I asked the same question earlier to one of your adversaries. Isn't this really a matter of focusing on that December 31 date and looking at the Shorrock factors at least largely and any other determinations or any other rules that might be out there and making your determinations to residency? We definitely agree that the Shorrock test is a good test for establishing whether someone has satisfiability. Well, that's only a partial answer, actually. I'm sorry. I'm trying to answer the question. I thought that I was. What I'm saying is that I believe that the Shorrock test is the right test and that part of that is a subjective analysis as to good faith, and certainly the court here has said the same thing. I have to raise again then. Are you suggesting that it's bad faith for a citizen of the United States to move from one state to another or from one state to a territory so they get to keep more of their own property? Is that bad faith? We think, as the Coyle Court makes clear, you can take that sort of tax avoidance motive into account. It's not determinative, as Your Honor said earlier. Okay, I choose to move to the Virgin Islands to save on my taxes. Does that make me any less of wanting to be a resident of the Virgin Islands than if I move here to do snorkeling? Aren't they both very valid reasons, equally valid reasons, to move to the Virgin Islands? Are they permissible reasons? Yes, but the courts make clear that you can look into tax avoidance motives and particularly tax avoidance motives. What's the matter with tax avoidance? I mean, I'd better call up my lawyer quick if there's a problem with tax avoidance. Well, I also think that we should take into account that this court, that this case involves an attempt to do a legal tax avoidance. In fact, it is now... We're only talking about the timing involved in the tax avoidance. If your position is that somehow the court may properly consider tax avoidance as some kind of improper motive, well, that guy won't hunt. That's just not correct. However, if the need to establish residency so quickly, by the end of this year, by the end of this time frame, pushed the taxpayer into having to take certain actions before that time and on an exigent basis such that they maybe could not have affected in that period of time what they needed to accomplish, then that would be an appropriate basis for considering the tax avoidance motive as a reason for the rush, as a reason for the haste, as a reason for the exigencies. That's right. That certainly is what the district court found. Well, I don't know what it is. That's what we're ultimately here to determine. But it seems to me that that's the kind of subtle distinction that needs to be made between just tax avoidance generally and what we have here focusing on that particular date. On JA38, note 49, the court says, while the Ventos could have taken into account whether they would receive a tax benefit from becoming bona fide residents of the Virgin Islands, consideration of their tax motive related to the OSI proceeds explains why they would take steps to appear to be residents by a very specific date, December 31, 2001. That goes precisely to what Your Honor just addressed. And the EDP program doesn't explain the situation here. Mr. Vento did not have any profits in 2001, as he testified on JA765. As he understood it, he would not be able to get any tax incentives from the EDP program until he was profitable. Some years down the road, he said he had a five- to six-year business plan. If you look at 765-67, it establishes that there really was no basis to say I need to be a resident in 2001 in order to get any EDP benefits. In fact, there's really no evidence to say that he anticipated having profits any time near 2000. Right. So let's assume that's persuasive. Note there's still tax benefits that they could try to take advantage of apart from EDP, or are you saying that's the only? That's the only one that's been identified. In fact, he says on JA765. I thought the RSI sale was the more salient purpose of establishing residency by the end of 2001. Right. And is there something wrong with that? Okay. As everyone has agreed, the only way that you could benefit from coming down to the Virgin Islands in a legitimate way in order to reduce your taxes is a program like the EDP. And since they couldn't get tax benefits by that, if, in fact, the OSI gains were their motive for moving down to the Virgin Islands, it cannot have been for legitimate tax avoidance purposes. It can only have been for illegitimate tax avoidance purposes. And how would that have played out? Well, as the – Would the DIR have taxed the OSI deal differently than the IRS? Actually, the tax limit that the district court found and that we believe is fully supported by the record is that the motive here was to try to hide other illegal tax maneuvers being made by the VENTOs. But isn't it in the record that the VENTOs testified that when asked if they had discussed tax avoidance and discussed whether the IRS was likely to audit them, more likely to – less likely to audit them in the Virgin Islands, that they said they hadn't discussed that? The district court is free to ignore that. As the VENTOs acknowledged in their – Well, what's the other evidence that the VENTOs came here thinking that the IRS would be less likely to do an audit? I'd say there's the circumstantial evidence of the timing. January 2001, they get this big gain from the OSI stock sale. February 2001, this is in 1802-03, they visit a financial advisor to try to reduce their taxes. And then March 2001, they visited Virgin Islands and announced, hey, we've decided to move to the Virgin Islands. And then later that year, in December 2001, while they're doing this Christmas party that the district court specifically found, it was manufactured to create the appearance of residency. They also had all of their accounts changed to – from being these daughter LLCs from United States entities, which would be then reported to the IRS. But the IRS, by agreement, is required to – excuse me, the VIR, by agreement, is required to report to the IRS the identities and tax returns of new Virgin Islands residents during the first year of their residency, are they not? Several things on that. The first thing is the tax implementation agreement, which I think is what you're referencing, was never argued below or cited to the district court at all. Secondly, there's no evidence whatsoever that Mr. Vento or any of the Ventos knew this about the tax implementation. Well, there's no evidence that they knew anything at all about it. You are saying we are looking at circumstantial evidence. Well, if we're going to look at circumstantial evidence, don't we have to look, as a matter of law, at the statutory regulations that would require the Virgin Islands to report these people in the first place? Even if the court chose to look at the tax implementation agreement and we think that's a problematic thing to do, the fact that there's no evidence that Mr. Vento knew about it means that it can't really count against the timing and the circumstantial evidence here. Because if he didn't know about it or none of the Ventos knew about it, then they couldn't have taken it into account. Can you outline for me the circumstantial evidence that you propose indicates that the Ventos moved here with the thought that they would avoid audit by the IRS? Sure. In January 2001, and this is J.A. 637-39, the Ventos got a large gain of about $180 million. It was going to be a substantial taxable gain. In February 2001, and this is going to be J.A. 1802-03, they consulted a financial advisor in an attempt to try to reduce the taxes on the OSI gains. March 2001, and this is going to be J.A. 590-93, and 660-61, they made their first visit to the Virgin Islands ever and announced that they had decided to reside in the Virgin Islands. In August of 2001, they bought Friedengal. It was also in August, it was around that time frame, that they engaged in the son of boss scheme, which they have now acknowledged was an illegitimate tax maneuver in which the IRS had announced in 2000, in Notice 2000-44, that they were going to be aggressively hunting out participants in son of boss and aggressively auditing and going after people who engaged in that particular tax shelter. The case was in what? The son of boss scheme. It's a particular type of tax scheme. If you look at Notice 2000-44, it addresses that. And this is the type of tax scheme, one of the types of tax schemes that the Ventures participated in. It was also in August of 2001 that they created BI Derivatives, which I believe was actually the vehicle for the son of boss scheme. And you can see that in our statement of facts related to the summary judgment motion in the federal partnership proceedings. That's going to be document 153 from 06-12. In December 2001, the Corps found that the Christmas party had been manufactured, citing specifically various bachelors of Virginia privilege as well as the state of the house. And they also, and this is 06-61 to 06-63, as well as 08-10, they required their banker to change the names and addresses of accounts to BI Derivatives that caused all of the tax information for those accounts that revealed the OSI gains to be reported to the BIR instead of the IRS if it properly should have. Thank you. So in answer to Judge Roth's question, what you're saying is by reporting to the BIR instead of the IRS, they intended to avoid IRS audit. Right. And they failed, but the fact that they failed does not indicate one way or the other, you know, what their belief was. They did fail. We did ultimately manage to audit them, but that doesn't mean that they didn't have belief. It doesn't mean that it wasn't reasonable for the district court to find that they had belief. There was a factual basis for it, and under this court's case law and the Supreme Court's case in Anderson, that's... Did the district court make a specific finding they intended to avoid IRS audit? Yes. I don't recall that finding. What finding is that? That's going to be in the supplemental order where he amended his, I believe it's at JA-44 to 45. But I also think if you look at JA-38, note 49, he talked about how the OSI proceeds were really driving the need to try to claim tax benefits in 2001. But in all events, you know, even if they were able to establish that they had subjective intent in 2001, the fact of the matter is that they don't satisfy the second part, which is a physical presence consistent with actually residing in the Virgin Islands, as well as looking at the nature, extent, and reason for absences. The district court found here that basically they claimed that they started... Richard and Lana claimed they started residence on August 2nd of 2001, but by August 15th they had left and didn't return until November. They then left again, both Richard and Lana, for periods between then and the end of the year. And what it appears is that they were coming back to the Virgin Islands for short-term purposes using round-trip tickets. So they would be in one of their homes or doing some other activities in the United States in their normal day-to-day lives, come in to do some short-term purpose in the Virgin Islands. And that would be that. And it's really that point. They weren't using the Virgin Islands as a residential base. They were coming here for short-term purposes before returning to their ordinary lives. Can we look at the events of 2002 and 2003 in considering what the intent was on December 31st of 2001? To an extent, to the extent that it's actually relevant, yes. I mean, I think the district court did that. The district court looked at 2002 and said, wait a minute, in January 2002, the Benches immediately left again. Richard and Lana left by January 6th of 2002 and then spent much of the next few months not in the Virgin Islands again. That certainly is evidence that the district court found to be relevant and weighed in. And that was a reasonable weighing by the district court to look at this evidence and to determine that ultimately that actually supported the conclusion that as of December 31st, 2001, they're not residents. Let me take you back to what is more the nature of the procedure on evidentiary issue. When I asked Mr. Chair about this, and perhaps I am misunderstanding the taxpayer's position, we heard a fair amount with respect to the presumption of correctness. I also thought I understood the taxpayer's position to be that the district court erred in its failure to apply or in its manner of application of 7491. And the proof, how proof would be deduced and how a burden of production would shift. I also think I understood, I also seem to recall that the government's position is that it was not applicable. Am I remembering correctly? All of this is correct. I've been trying to figure out if that is the position of both sides, just how this section works, just how it plays out with a district judge, with a trial judge. The way it actually operates as a manner of procedure is that the taxpayer is supposed to raise 7491 and establish that they meet all of the requirements, including cooperation, including that they have produced enough credible evidence, including if they are an entity, such as VI derivatives or VIFX, that their net worth does not exceed a certain limit. Since 7491 was never raised below by any party, including the Ventos, they did not satisfy that burden to try to show that they satisfied 7491. Does it have to be explicitly raised if this is really the burden-shifting regime that a trial judge ought to be applying in this type of case? They have to, but it is the taxpayer's burden to show that they've met all of the requirements. The taxpayer's burden to initially show some credible evidence, after which the burden of production shifts to the IRS, right? They also have to show that they cooperated with reasonable requests, which in this case they can't. They fought tooth and nail giving over documents. They tried to produce documents during trial that they hadn't produced before. They certainly can't meet the cooperation requirement. And as it happens here, the court did not find their evidence to be credible. But in all events, not only are these arguments, in fact, they conceded, the Ventos conceded burden of proof below, but in all events, it's not relevant in this particular case because everyone put in evidence and then the court weighed it and determined that for Richard and Juana, he was, quote, compelled to find that they were not and that the daughter's cases were even easier to resolve. That's JA 37 and 40. So each... In that respect, could you address the question I asked Mr. Dershowitz about the dollars involved? I don't know that I could approach the specific numbers, but it is my understanding that there's more money in the daughters than in the parents, at least as far as the tax things that are involved here. Do you disagree with Mr. Dershowitz that it's not particularly meaningful? It's obviously real dollars, but is it not particularly material for practical purposes? I'm not entirely sure I understand that question. I do think that we need to take each of these Ventos separately and that Richard and Juana are one and that each of the daughters are separately. And there's money attached to each that is some amount of money that is a reasonable amount. But you can't quantify any of it for us? I can't quantify it specifically. But it is my understanding that there is more money in the daughters than there is in the parents. I see that my time is up. Would it be possible for me to address any other points? Yes. Put five minutes on the clock, please. Thank you so much. I appreciate it. I would like to address a few of the specific points that were made by my opponents. And the first is, what was the intent and structure of 932? In 934, was it the intent to create a very loose standard here, a looser standard than in 871 and 911? Or instead, was it the intent to basically apply the same standard just with a different date, December 31, 2001? As well as the claim that 932 gives the Virgin Islands the right to make all these determinations. Actually, the evidence, if you look at what's going on here, and I'm going to specifically point you to the legislative history for the Tax Reform Act of 1986, there really has been an over-claiming as to what Congress intended here. And if you look at page 484 of that, you will see that the Secretary of the Treasury was given specific authority to try to prevent abuse of the tax incentive programs of the Virgin Islands that were authorized in 934. And specifically on that page, Congress said, where appropriate, the Secretary may treat an individual as not a bona fide resident of the Virgin Islands. Now, ultimately, there's nothing in the statutory language that says that the Virgin Islands should have the right to determine who is a resident. Moreover, the claim that there's a presumption of correctness here really makes no sense. Because ultimately, all of the case law talks about presumption of correctness of a taxing authority vis-à-vis a taxpayer. Nothing, I've found no cases, and certainly my opponent's side has none. What about my question earlier about the breadth of the presumption? I mean, should it apply to every determination that has been made? I think generally it does apply to every determination that has been made. But, you know, certainly when you're talking about taxing authority versus taxing authority, I can't find anything that says it applies to any determination. And if you look at the Johanssen case, it specifically stated that just because a foreign country has made a determination as to residency, doesn't mean that has any effect on what the IRS can do. Moreover, there's a jurisdictional point that was made at the end of the Vento's counsel's argument. And the fact of the matter is, the district court here had jurisdiction over two flavors of cases, territorial cases and federal partnership proceedings. And under the federal partnership proceedings, there's actually a presumption of correctness that attaches to the United States determinations. And what that means is that you basically have two sets of cases that were combined, where each of the taxing authorities could say, hey, I've got a presumption of correctness on my determinations. And that's why to an extent nobody argued presumption of correctness below, because ultimately you have two different taxing authorities who disagree. And what the court did is they heard from everybody and weighed it. Under Blodgett and under, you know, all of the case law, you don't even need to find vernal proof. And you certainly can't find error where there was a weighing of the evidence under presumption of correctness of the evidence. Now, turning to the next argument, which is about Freidendahl, which is, you know, the conclusion that it was not livable, that the district court made. And he made this based on several different items, largely based on Thomas' testimony. Now, my opponent reads his testimony and says it's 50% livable, meaning half the rooms were in fine shape. And the other half of the rooms, well, those were, but you can live in that first half. The way I think that the district court read it, and I think this would seem to be correct from how he interpreted it, is that it had only reached a level of, like, 50% of the way to livability. You know, and if you look at the testimony, and you can look at the home inspector's report, you look at Dave Thomas' testimony, you look at the statement of Lana, that the only things she wanted to keep were the rock walls and the floor, and you look at Richard Benson's admission that everything... Look at what upgrades they wanted to make it nice in light of their wealth. That's different than whether you can live there. In fact, Mr. Thomas, he lived there the whole time he was working on the house, didn't he?  I'm not saying, you know, it was a place you or I might want to live, but there's difference between livable and where one would like to live, right? I guess what I'm suggesting is, isn't it clearly erroneous to the extent that Charles just said it was unlivable? If you look at what he actually found, he found that they had tried to make it look like a residence and then took everything out of there so the entire place could be dismantled. Between the home inspector's report and Dave Thomas... Well, that's a separate issue. That goes to whether the Christmas party and all its trappings were a subterfuge with the extensive photography, et cetera, et cetera. It does go to the question of livability. If you look at the home inspector's report and Dave Thomas's statement, almost everything needed to be repaired or replaced, the electricity, the water supply, the plumbing, the concrete supports, the walls, the roof, the kitchen appliances, the cooling systems, the entrance gate, the dock, the railings, the pools, all of these things needed repairs. Okay, but look at it this way, too. They bought a house to become residents down here, a house needing extensive repairs. Do they not actually become residents until they finish the repairs? They need to be able to establish that they had and could have really the requisite physical presence consistent with this being a residential base, consistent with it being a home, and they can't show that. I mean, ultimately... So let me just... I can't resist giving you one other hypothetical. So then two hypotheticals. So under the test, if somebody... if the Ventos moved into this home and spent July 1st through December 31st, 2001, they registered to vote, they paid taxes, they voted, and they actually lived in the house. Those six months continuously, they win. But if they buy the house, they come and they look at it, they say, gee whiz, it needs a lot of work, they invest a lot of money to make it habitable, and on January 2, they move in, and they live there for the next nine years. They lose. Is that the way the law works? Yes, that is the way the law works, because the date is December 31st. And sometimes in the residency contract, there can be harsh results. Look at the Dawson case. In the Dawson case, it's understood that they spent more than a year in this foreign location in Australia. They didn't happen to move there until January 3rd. January 1st and 2nd were holidays, so they couldn't have started work until January 3rd. And so a lot of your answer then, it really isn't as important whether they did it to avoid taxes, whether they came for the snorkeling, whether they liked the view. It's really about the actions, when they were here and what happened when they were here, or when they weren't here. I believe, and I think this really isn't at this point in dispute because it was acknowledged by my opponent, you need to have both the subjective intent to reside in that year and you need to have the requisite physical presence in that year. So if they came and they were basically, and the court determined that they were basically pretending because they had an improper motive, say it was actually found for illegal felonious tax evasion, then, you know, find that. But what I'm saying is you need to have both. You need to have both. And if this court were to find, contrary to what the district court found, that they had one, they still lose because they don't have the other. And that's what it really comes down to is you have to have both. That's the Shurik test, that's the Offenberg instructions, Adams, Bergersen, they all make this clear. Coyle, you need to have both. Thank you very much. Thank you. If we could have Mr. Chair back on. Can we switch the letter, Your Honor, with your permission? Certainly. Six specific points. One is an answer to both Judge Hardiman and Judge Roth. The position being taken now by the IRS is inconsistent with the new regulations that were in the JOBS Act which recognized that you have to take a forward-looking approach. When was the JOBS Act passed? It's 2004. So how is it relevant? It's relevant because it reflects an attitude on a question that I think you're asking, and that is it recognizes that it's so difficult to prove in the year of a move residency that they recommend that you look forward in order to make the determination. That wasn't the law that governed this case, though. No, it wasn't. But it's an attitude. Second, with respect to the concession on 2002, this is not what we're talking about of a government concession of the type they're talking about. This is an opening statement framing the issues for purposes of the trial, and you can't then walk away from what you framed the issues as at the end of the trial. Well, they do have a point. It's not evidence. It's an argument of counsel. But it frames the issues and frames the approach that you take, and therefore you're trying. For example, I defy the government to tell me what real difference they can point to between the year 2002 and 2001 that goes to residency in the context of this case. And so you're emphasizing, we're emphasizing what happened in 2001 because of the concession in 2002. So you make your arguments predicated upon what the approaches that the government took. The major problem with the government's approach right now is this notion that because they came to set up corporations, they made $180 million, they want to take those funds, and they understand that they get tax benefits if they set up new corporations. Mr. Bento was not retiring. He was going into new ventures. He understood, as he testified, that the EDP provides for these programs. You have to be a resident. Residency comes before you end up being a you apply and you get the tax benefits. So he wants to be a resident. He sets up the corporations. He then starts the corporations. He looks for things. And then he hopes to get the benefits, the tax benefits, in two, three, four years. That's only part of the equation, the government argued. And the trial court made a specific finding. By avoiding filing taxes with the IRS, the Ventos could minimize the chance the IRS would detect the OSI stock sale. That's a finding of the trial court. How do we undo that? By trying to find one piece of testimony in the case to support that notion. It was made up post hoc after the court first determined that it was a tax avoidance. It was observed to the court that because of the mirror code, that was an impossibility. So what the court did after its findings, it then, months later, in response to a new trial motion, came up with this post hoc rationale. But there is no evidence in the case to support that post hoc rationale. Why isn't the evidence simply that if the Ventos were bona fide Virgin Islands residents, they would have filed with the BIR and not with the IRS? Isn't that a fact? That's a fact. Then the inference that the trial judge drew was that they might have created some audit benefit by filing with the BIR instead of the IRS. On the basis of what evidence? A supposition that the BIR is not competent? A supposition that the BIR doesn't do its job? It doesn't mean the BIR might not audit, but it indicates that the IRS won't audit, which is a fact. Because the IRS, it's not within the IRS's purview once it's filed only with the BIR. But the BIR is a functionary of the IRS for purposes of examining the taxes. And to the extent the IRS disagrees, it does it on its own. So there's no predicate for that. It's an assumption based upon nothing, nothing in the record, no testimony in the record. And it's a false assumption, which I suggest should be offensive to the BIR. It assumes the BIR is not competent and assumes that when the IRS then looks after what the BIR did, that neither one will find it. I mean, they said that they had no thought of that. Can I just make? No. We're strict on rebuttal and haven't been very strict for the last minute and a half. Thank you very much. Thank you. Mr. Schauer. Thank you, Your Honors. I have just four points I'd like to make, mostly in response to questions from the bench. First of all, Judge Hardiman, you asked how much money is at stake with respect to the parents versus the daughters. And there's significantly more tax dollars at stake with respect to the parents. The BIR's notice of deficiency to the parents was for $25 million approximately. And the notices with respect to each of the daughters was for about $5 million. And, of course, that's before interest and penalties and those sorts of things. Second, Judge Roth, you asked some questions about the likelihood of an audit. And that's an issue on which we think the district court's conclusion, if you want to view it as a factual conclusion, that Mr. Vinto believes an audit was somehow less likely if he filed with the BIR. That's a clearly erroneous factual conclusion for reasons that we've already discussed there. The only evidence on that point in the record is Mr. Vinto's denial that there were any discussions of that. And the circumstantial evidence that Ms. Rubin cited is so circumstantial as to be meaningless. There's just no way that you can infer from the recitation of the facts that Mr. Vinto really thought that he would be reducing the likelihood of an audit. If you're going to consider circumstantial evidence, don't you have to consider that the BIR is required to report this category of tax payers? Exactly, Your Honor. And, of course, here it's relevant that the BIR conducts its own audit. It conducted its own audit of the Ventos. And the BIR discovered this issue with the OSI sale, and that was a large part of the basis for the BIR's own notice of deficiency. So, you know, to the extent that you're going to draw inferences from circumstantial evidence, there's a lot of evidence that points in the opposing direction on that point. But we just don't think it's a fair inference at all. So we think that factual finding was really clearly erroneous. Judge Smith, you and Judge Hardiman both asked, why don't we just focus on December 31st, 2001? And we think that's exactly the right question. What was the Ventos' intent as of that date, assuming that they had a sufficient presence? Well, let's assume they had the intent because of all the benefits that might accrue to them. Right. The real action, it seems to me, is on the presence issue. And they were physically present on December 31st, 2001, as I recall. They were physically present in the VI bin. They had been physically present. You're suggesting that one day is enough? Certainly in combination with the rest of the undisputed evidence. Well, again, under this unique and now repealed statute, the question, the residency is determined as of the last day of the year. So, yes, given the statute that you're dealing with here, that's how you have to make the determination of residency, is what was their intent on the last day of the year. If they were present and they had an intention to make a residence in the Virgin Islands, then that's enough under the statute as it existed then. And Judge Hardiman, you also asked a hypothetical about, you know, what happens if they're renovating a house and it's not ready until January 2nd. And I would say in response to that hypothetical, as long as they have a presence in the Virgin Islands as of December 31st, that's sufficient combined with the evidence of their intention, which would be based on their renovations for the home and all of that. Finally, and Judge Smith, you asked whether we're not just asking the court to re-weigh the evidence, and we're not at all. When you look at the district court's opinion, there are a total of two paragraphs of analysis of residency with respect to Mr. and Mrs. Vento. It's on pages 36 and 37 of the district court's opinion. And there are really three key findings or three pillars, if you will, of the district court's ultimate conclusion of non-residency. One of them is the tax avoidance idea, which is just implausible and clearly erroneous. The other is the habitability finding with respect to the house, which we think is also clearly erroneous in the sense that it lacks any credible evidentiary basis. The undisputed evidence was that the house was habitable in the sense that people were living there. It might not have been as habitable as it later was after $20 million in renovations, but people were living there during this entire period. And that leaves the district court's discussion of the continuing contacts with Nevada. And on that point, we think that part of the court's analysis is based on a legal error because he was assuming that mere continued contacts with Nevada were actually evidence pointing against residency, when in fact the only way that evidence would have been relevant to whether they actually had established a residence in the VI is if they were in Nevada for so many days that the VI property was clearly only a vacation residence. But there was none of that established, and as Mr. Dershowitz said, when you look at the American Express receipts and all of that over the relevant period, they in fact were in the VI more than they were in Nevada. All right, we understand your position, Mr. Chairman. Thank you very much. Thank you. Thank you to all of counsel. The case is a significant one, as was noted at the outset. The case was very well argued by everyone. I can't help but reflecting. Ms. Rubin, you used a phrase a number of times at all events, and I think about the only time I've heard that used was by our late colleague, Eddie Becker, who frequently referred to matters at all events. Thank you very much. You'll ask the clerk to adjourn the court.